## No. 9398.

EBEL *v.* ROCK ISLAND IMPLEMENT COMPANY, ET AL.

1. FRAUDULENT CONVEYANCE—*Husband and Wife.* Transactions between husband and wife are to be closely scrutinized. But a husband, honestly indebted to his wife may prefer her to other creditors, either by payment in money, or transfer of property.

That the wife's action against the husband is barred by the statute of limitations is immaterial.

2. STATUTE OF LIMITATIONS—*Duty to Plead.* An indebted person is under no duty to one creditor to plead the statute of limitations to the action of another.

3. FRAUD—*Evidence.* Husband had conveyed lands to his wife in preference to other creditors; but he continued to reside with his family upon the land so conveyed, assisting in the improvement and cultivation thereof. *Held* no evidence of fraud in this conveyance.

*Error to Rio Grande District Court, Hon. Jesse C. Wiley, Judge.*

Mr. JAMES P. VEERKAMP, for plaintiff in error.

Mr. H. W. HOWARD, Mr. WM. B. VATES, and Mr. E. C. ELLIS, for defendants in error.

Mr. Justice Scott delivered the opinion of the court.

THE complaint in this case, by Rock Island Implement Company against the defendants below, Christ Ebel and Katie Ebel, his wife, alleged in substance that Christ Ebel on August 17th, 1911, executed and delivered to the plaintiff two promissory notes in the aggregate sum of $2,210, and upon which plaintiff secured a judgment against Ebel in the District Court of Russell County, Kansas, on January 5, 1915, in the sum of $2,502 and costs. Further, that judgment was rendered in the District Court of Rio Grande County, Colorado, based on the Kansas judgment, on September 25, 1915, against Ebel in the sum of $2,848.55; that Ebel had been the owner of a tract of land containing 720 acres in Russell County, Kansas; that he exchanged this tract of land for one in Rio Grande County, Colorado, during the month of December, 1913, consisting of 240 acres, with certain water rights; that he caused the deed to the Colorado land to be executed to Katie Ebel, his wife, with intent to cheat and defraud his creditors, and particularly the plaintiff; and that Katie Ebel knowingly joined in the fraud; that Christ Ebel, except for the Colorado land was insolvent.

The prayer was for a decree adjudging the title to the Colorado lands to be held in trust by Katie Ebel, and that the premises be sold upon execution as the property of Christ Ebel, free from any claim by Katie Ebel, and that the proceeds from such sale, after payment of costs, be applied to the payment of the plaintiff's said judgment.

Katie Ebel filed her separate answer in which the judgment against Christ Ebel was admitted and as unpaid; ad-

mitted the ownership of the Kansas land to have been in Christ Ebel, and the exchange for the Colorado lands, and that the same were conveyed to her; alleged that there was at the time of the exchange a mortgage on the Colorado lands in the sum of $15,000.00 and a mortgage on the Kansas lands of $16,000.00; denied any fraud or fraudulent intent in the conveyance to her, and alleged that the conveyance was made to her in payment of a valid and existing debt due at the time, from Christ Ebel to her.

It seems that Christ Ebel, in 1916, filed his petition in voluntary bankruptcy in the Federal District Court for Colorado, and the trustee in bankruptcy was made a party to this suit.

The decree of the court was that the plaintiff have a valid and subsisting lien upon the premises to the extent of its judgment; that Katie Ebel was a trustee for the creditors; and ordered the premises to be sold at execution sale and the proceeds applied as follows:

1.    To the payment of costs:

2.    To the payment of the sum of $1,200 to Katie Ebel with interest from December 20, 1913.

3.    To the payment of the costs of the prior suit in Rio Grande County, of the plaintiff v. Christ Ebel;

4.    To the payment to the trustee in bankruptcy of the sum of $2,848.55, with interest from September 29, 1915; the remainder if any to abide the further order of the court.

It is this judgment that is before us for review.

The testimony shows without dispute that the defendants, as husband and wife, emigrated from Russia and located in Russell County, Kansas, in 1885, and that Katie Ebel brought with her as part of her father's estate, 1,500 rubles Russian money, for which she received about $750.00; that shortly after their arrival, she loaned the sum to the father of Christ Ebel, who repaid it to her at the expiration of about two years, and that she then loaned it all to Christ Ebel under his promise to repay her, and that this sum nor any of it had been repaid at the date

of the exchange of properties. It was this sum so borrowed from his wife and about $250.00 which Ebel had saved from his labor as a section hand with which Ebel started in the business of farming, and later as a dealer in live stock, until he had acquired the 720 acres so traded for the Colorado land, together with some live stock, and a residence in the town of Russell.

Several years before the exchange of lands, Katie Ebel received about $350.00 additional from her mother's estate, which she also loaned to Christ Ebel at the time, under like agreement to repay, and which had not been repaid.

Sometime before the exchange of lands, Christ Ebel had extended his credit to his son-in-law, who was engaged in the agricultural implement business, and who appears to have failed, and Christ Ebel was called upon to make good his losses. To do this, he mortgaged the 720 acres of land in the sum of $16,500.00, which he paid on his debts. This not being sufficient, he later executed the two notes to plaintiff out of which the present judgment grew. In the exchange of lands, each party assumed the respective encumbrances as above stated, and Christ Ebel received $1,600.00 in cash which he applied on his said indebtedness.

It appears that after the transaction, the husband and wife sold their home, and that this money went to Katie Ebel, but the court found that there was at least twelve hundred dollars due her at the time of the conveyance, which was the consideration in the deed to her.

The court held that the deed was in trust, that the lands held by her were simply as trustee, and apparently for the purpose of securing the payment of claims of creditors.

There is not a scintilla of evidence in the case to support the theory of a trust. Under the pleadings and evidence there was not a trust created by operation of law.

The complaint alleged that the conveyance was made in fraud and for the sole purpose of cheating and defrauding the creditors of Christ Ebel.

Both Katie Ebel and Christ Ebel testify positively that

the deed was made in consideration of an indebtedness due, and was in satisfaction of such indebtedness, and was absolute in fact. There is not a suggestion of anything to the contrary in the evidence.

Then, under the facts of this case, the deed was either in fraud of creditors, and for such reason void *in toto*, or it was made in reasonable consideration for a valid existing debt and is valid and binding as against creditors.

The court specifically found in its summing up at the time of rendering judgment that no fraud appeared on the part of Katie Ebel. He did not find that there was any fraud on the part of Christ Ebel. His conclusions, delivered orally, were in the exact language as follows:

"I presume it is not necessary to recount all the matters that grew out of this litigation from the time of its inception. What is more important is from the time that Christ Ebel became involved while he was in Kansas. It appears in evidence that he traded some land in Kansas for some land here in Colorado, that is traded equities, and in taking title to the Colorado land, the title was taken in the name of Katie Ebel, wife of Christ Ebel, one of the defendants here also. It appears from the evidence here also that while they lived in Kansas, prior to coming to Colorado, the defendant, Katie Ebel, inherited some money and this she turned over to her husband, the defendant, Christ Ebel, which was used in and about the business investments. The defendant, Christ Ebel, having control and management of all of their property. There has been some evidence as to the two defendants having a house and lot in Russell, Kansas. This was sold and the proceeds were taken by the defendant Katie Ebel, which, as the court remembers the testimony of the defendant, Christ Ebel, was to apply on what he owed at the time the title was taken to the Colorado lands. He contended that there was a balance of thirteen hundred dollars still owing on this patrimony, the title having been taken by the defendant Katie Ebel to the land here in exchange for equities held by the

defendant Christ Ebel in Kansas, would form a trust if there was any equity there above the amount of the mortgage on the land here. The court can only take the defendant's testimony as to that. Defendant Christ Ebel testified that he considered he had an equity of $10,000 in excess. If this trust was once created, it still remains, but he also has a right to prefer the defendant Katie Ebel as a creditor. There being no fraud appearing on her part, the conclusion would be then that she was a preferred creditor for $1,300.00, and the balance of the property in Colorado would be subject to this creditor's claim."

It was hardly fair to say that Christ Ebel testified "that he considered he had an equity of $10,000.00 in excess." The court seems to have overlooked the exact testimony on this point, rather seeming to rely on recollection. This testimony was upon cross-examination, and was exactly as follows:

"Q. You came out and looked (the land) over? A. Yes, sir.

Q. And you went back and reported to her what you had found out here? A. Yes, sir.

Q. And tried to describe it to her, did you, and told her about it as nearly as you could? A. Yes, sir.

Q. And how far from town it was? A. Yes, sir.

Q. And what kind of land? A. Yes.

Q. And the irrigation and all those matters? A. Yes, sir, just the way I found it.

Q. You told her what you thought it was worth? A. I couldn't tell her what it was worth at that time. I told her what people told me."

And again:

"Q. Now, sir, you traded equities worth from $10,000.00 to $12,000.00 out here, that is what you were trading for? A. I don't know.

Q. That is what you thought you were trading, was it not? A. Maybe it was and maybe not.

Q. And you came out here and got a ranch with a $15,-000.00 mortgage on it? A. Yes, sir.

Q. And equities about equal? A. Yes, sir.

Q. And when you bought that you thought you were getting $10,000.00 or $12,000.00 worth of property, didn't you? A. Yes."

It will be seen that he knew nothing about the value of the Colorado lands except what had been told him, apparently by those who were dealing with him. He had seen it but the one time.

His testimony does not go to any positive statement of value, but simply as to what he had been told in that regard, and of this he did not tell his wife. He was not even asked the question as to the value of the equity in the Colorado land at the time of the exchange of properties.

The law applicable to this case in general is well stated in 20 Cyc. 599, as follows:

"While transfers of property by a husband to his wife should when charged as being fraudulent be very clearly scrutinized on account of the opportunities afforded by the confidential relations of the parties for the perpetration of fraud, yet a husband honestly indebted to his wife may give her a valid preference either by transfer of money or property in payment or by giving security, to the same extent that he may prefer any other creditor, and such a preference is not of itself fraudulent as to other creditors of the husband. In this respect it has been said that the same principles apply between husband and wife as between any other persons occupying toward each other the relation of debtor and creditor. That the debt is for money lent by the wife out of the proceeds of her individual property which was given to her by the husband when perfectly solvent does not affect the validity of the preference, although the husband is then insolvent. The fact that the debt or part thereof is barred by the statute of limitations does not affect the validity of the preference, for the husband is under no duty to his creditors to interpose the statute; and indeed

it has been held that neither the statute of limitations nor the presumption of payment from lapse of time has any application to the husband's debt to the wife."

This doctrine has been fully sustained by the Colorado Courts. It was held in *Knox v. Clark*, 15 Colo. App. 357, 62 Pac. 334:

"Knox was indebted to the plaintiff for money which she had loaned him upon his promise of repayment. The money was derived from property which he had given her a number of years before the transaction in question, and while he was free from debt. His business enterprises had been unsuccessful, and he was deeply involved,—in fact, insolvent. Realizing his financial condition, he executed and caused to be recorded two deeds purporting to convey to the plaintiff the real estate afterwards levied upon, in partial discharge of his indebtedness to her. He also executed deeds to others of his creditors for the purpose of discharging his debts to them. This record discloses nothing to impeach his good faith in any of these transactions. He had the right to prefer creditors. His wife, as a creditor, was upon the same footing with the others, and the fact that he made deeds to her in consideration of a portion of the amount which he owed her, does not afford the slightest ground for impugning either his motives or those of the plaintiff."

See also *First National Bank v. Kavanaugh*, 7 Colo. App. 160, 43 Pac. 217; *Stramann v. Scheeren*, 7 Colo. App. 1, 42 Pac. 191; *Home Savings Bank v. Hunkey*, 63 Colo. 231, 165 Pac. 987; *Thuringer v. Trafton*, 58 Colo. 250, 144 Pac. 866.

In the case of *Loveland v. Kearney*, 14 Colo. App. 463, 60 Pac. 584, it was held:

"Where a husband borrows money from his wife, with a promise to repay it, even thought it be in a state where the common law rule as to the personal property of the wife prevails, and although she might not be able to enforce her claim at law, yet an equity would exist in her favor that

would constitute a valid and sufficient consideration for a conveyance of real estate to her by her husband."

This was precisely the state of facts in the case at bar except that the deed was not given in a state where the common law rule prevailed, but under statutes similar to our own.

Clearly there is not a fact nor circumstance appearing in evidence to indicate other than good faith on the part of Katie Ebel and the court so found. The consideration was a valid and existing debt, and the court so found. Neither is there testimony in the case to indicate bad faith on the part of Christ Ebel, and the court did not find to the contrary.

Mrs. Ebel had loaned the money which had enabled Ebel to start in business, always with the agreement that it was to be repaid. It was not repaid. It furnished the basis of their after accumulations.

Ebel became involved, not because of his own business transactions, but as security for another. To pay this indebtedness, he mortgaged his farm for $16,500, and he also used all the money he received in the exchange of lands for the payment of these debts, which altogether consumed substantially his entire fortune. The only other indebtedness the record discloses was the balance due plaintiff, represented by the two promissory notes sued on. His indebtedness to his wife was in excess of this. She demanded to be paid and preferred as a creditor. He had a right under the law to do this. It was reasonable under the circumstances that she should make this demand, and it was likewise reasonable that he should grant it. This man and wife had ten children living. Five of these were boys all living at home, ranging in age from twenty-five years to nine years. The debt to the mother represented substantially all that remained of their property.

The only circumstance that seems to be relied on is the claim that the equity in the Colorado land was greatly in excess of the consideration in the deed. This is not justi-

fied by the evidence. There were five witnesses who testified upon this point. All of these testified that there was no market value at the time for the Colorado lands.

Clark Hurd testified that he had been engaged in the real estate business in that vicinity for six years; that there was no land selling at or about the time of the exchange of properties; that the land at the time, in his opinion, was worth $60.00 to $65.00 per acre; that he had a great many tracts of similar lands listed for sale, and that he had offered these for such values and less; and that he could not sell any of them. He further testified that the depreciation in value of lands in that locality began in the fall of 1911 and spring of 1912, and from that time on until eighteen months before the trial, it was practically impossible to do anything but trade. Since that time the tendency has been upward.

Boyd Wallace, residing in that locality, who had bought and sold lands, testified to the same value, $60.00 to $65.00 per acre.

Silas Bunn, residing at Monte Vista, in the vicinity of the lands, engaged in the real estate business, and well acquainted with the property, testified that the probable value of the lands in question at the time of the trade was from $45.00 to $55.00 per acre; that there was no stable value for lands in that vicinity; that one could not sell land at that time at all.

W. H. Fishnell, a farmer, testified for the defendant that the value of the land at the time of the trial was from $80.00 to $90.00 per acre. He gave no testimony as to its value at the time of the trade, but on cross examination, testified that at that period the sale of land was at a standstill; that one could hardly sell land at all at that time.

W. R. Williams, a farmer, testified that the land was worth $80.00 to $100.00 per acre. He gave no basis for his knowledge on the subject, except "just because it was worth it." He knew of only three sales of land in the vicin-

ity in his many years residence, but did not give the consideration in the case of a single sale.

If we are to accept the highest value placed on the land by any one of the three witness who seem to know anything about it at all, $65.00, then the value would be $15,600.00 for the 240 acres, or $600.00 in excess of the mortgage. The consideration in the deed was $1,200.00. Clearly there is no testimony tending to show any such excess in value over the consideration paid, as will sustain a charge of bad faith, or fraudulent intent.

Counsel argue that Christ Ebel went with his family to the lands and continued to reside and labor on the farm. He lived with his family and seems to have tried to do all he could to help to farm and improve the land.

What else could he do? His property was gone. Can it be said that he must desert his wife and abandon his family in their distress in order to show good faith with his creditors? There were three of the boys each above twenty-one years of age, besides the younger ones, who worked with the mother and other children, to improve the land, to grow crops on it and to make a living.

At the time of the trial, they had seeded much of the ground to alfalfa, cleaned out the ditches and improved the lands otherwise for cultivation. They had grown crops and otherwise earned enough to enable the mother to pay about $5,000.00 on the existing mortgage. We see nothing in all this to furnish evidence of bad faith or fraud.

The judgment is reversed with instructions to the trial court to dismiss the action.

Judgment reversed with instructions.

*En banc*

Teller and Denison, J. J., dissent.

Mr. Justice Teller dissenting:

The question whether Mrs. Ebel took the land in payment of her debt or as security for it, was one for the trial court to determine. I find nowhere in the record any evidence to show that the Colorado land was taken as a settle-

ment of the debt. Mrs. Ebel said in answer to the question how the deed happened to be made to her, "I wanted the deed in my name so that I could get my money." This fully sustains the court's finding that she took the land as security only. Even if the matter were not clear that she so took it, so long as there was ground for the suspicion that Ebel had the deed made to her to defeat the claims of his creditors, the decree which protected her rights does equity to all the parties. It is supported by the decision of Chancellor Kent in *Boyd v. Dunlap*, 1 Johnson's Chancery, 476.

For these reasons, I think the decree should be affirmed.